## Broughton, By, etc. v. Broughton.

(Decided June 10, 1924.)

### Appeal from Harrison Circuit Court.

1. Frauds, Statute of—Oral Agreement to Devise Within Statute.—
   An oral agreement to devise real estate to another in considera-
   tion for services to be performed is within statute, and ordinarily
   cannot be enforced.

2. Frauds, Statute of—Recovery May be Had upon Parol Contracts
   to Devise when Fully Performed.—Recovery may be had on parol
   contracts to leave property by will in consideration of services,
   where consideration has been fully performed.

3. Wills—Measure of Recovery Under Parol Contract to Devise.—
   Measure of recovery, in action on parol contract to devise prop-
   erty in consideration of services, depends upon character of
   service, and, where benefit to intestate can be measured by ascer-
   taining reasonable value, such will be measure of recovery; but,
   where benefits cannot be measured by ordinary pecuniary stand-
   ards courts award claimant value of property promised.

4. Wills—Contract to Devise Must be Clearly Shown.—In order to
   warrant recovery on parol contracts to devise in consideration
   of services subsequently performed, contract must be established
   by convincing proof.

5. Wills—Contract to devise Held Not Sufficiently Shown.—Oral
   contract to devise property held not convincingly shown.

W. S. CASON and WADE H. LAIL for appellant.

M. C. SWINFORD for appellee.

OPINION OF THE COURT BY JUDGE McCANDLESS—Af-
firming.

G. W. Broughton was twice married. His first wife
bore a son, Arthur, and died early in life. Afterward
he married the sister of his first wife, but no children
were born of this union.

Broughton was a blacksmith by trade and at the
time of the second marriage had no property, and was in-
volved in debt. Both he and his wife were industrious
and frugal and by dint of economy and thrift succeeded
in accumulating some property which at the time of his
death was of the value of over $10,000.00. In accom-
plishing this the wife was largely instrumental.

Arthur grew to manhood and married and brought
his wife, Ivy, to his father's home, where a son, Forest,
was born. The families were entirely congenial and

lived together in amity. Prior to this G. W. Broughton had purchased a farm and ceased working in the shop and after Arthur's marriage the two worked the farm in partnership.

Arthur died shortly after the birth of Forest. The elder people were fond of the widow and child and the latter two remained in the same home, though the mother sometimes found employment elsewhere.

Later Ivy Broughton married William Crawford. At that time Forest was about three years of age and the old people had developed a strong affection for him and G. W. Broughton was desirous of retaining him in his household, and on the day of the marriage an arrangement was made between him and Ivy to that effect, and this agreement seems in the main to have been carried out.

William Crawford and his wife moved to a different neighborhood and lived for a time, but later purchased and moved upon a farm adjoining that of Broughton, and have lived there since that time.

G. W. Broughton died in the year 191— leaving a holographic will which was duly probated. In it he devised certain specific legacies and provided that after the payment of his debts the remainder of his property should be divided equally between his surviving widow and his grandson, Forest, with the further provision that if the latter died before reaching the age of 18, that his share should be divided among certain educational institutions.

In a suit to settle the estate the guardian *ad litem* for Forest filed an answer and counterclaim, the character and sufficiency of which are called in question. However, we will assume it to state a cause of action in favor of Forest, either to recover the value of his grandfather's estate, or to enforce the specific performance of a contract to devise same to him, under an alleged agreement between his mother and grandfather in which the grandfather agreed to give him all his property at his and his wife's death, in consideration of the mother surrendering to him the care, custody and control of Forest, and permitting him to live with his grandfather during the latter's lifetime. The prayer being for an immediate division of the property, one-half to him and the other to be used and enjoyed by Mrs. G. W. Broughton, during her life but to be impressed with a trust for his benefit and to be received by him at her death.

It is claimed that the agreement was made on the occasion of the marriage of Mr. and Mrs. Crawford, which took place at the home of Mrs. R. C. Bell; these three were present and all have testified in reference to it.

Mrs. Crawford testifies: "Well, after the wedding when I got ready to go home Mr. Broughton was there and brought Forest to the wedding. He came to me and asked me if I was going to let him take the boy home with him. I told him my husband was willing to take the child with us and he said if I would let him have the child he would keep the child as long as he lived and he could have all he had at the time of his and his wife's death, and I told him he could have the child if he would take good care of him and clothe and school him and if I lived any distance away he would allow him to come and visit me several weeks at a time. He told me the child should never want. . . . ."

She further states that she had not had any previous conversation with Mr. Broughton about the matter; that nothing was said as to what Forest would do or where he would stay in the event Mrs. Broughton outlived her husband, or what was to be done with the property during that period of time.

Mrs. Bell testifies: "Well, I was present with her, standing in our hallway at our home just before my sister left and Mr. Broughton insisted on her not taking the child away and told her that if she would leave the child and let him have the child he would see at his death and his wife's death that he should have what was left."

On cross-examination she stated: "He said he would take him home and take care of him and school him and clothe him, and at his wife's death he would let him have what was left;" that he did not say anything about deeding it or making a will, nor did she hear him otherwise say as to whether he (Forest) was to have the property at his death or at his wife's death.

Mr. Crawford states: "Mr. Broughton asked my wife was she going to let him take Forest and she told him that she did not see how she was going to give her own child up and he made her a promise before me and Mrs. Bell and her, that if she would let him have the child, the child could get what him and her had at his and her death and he would clothe him and school him and pay his doctor's bills."

On cross-examination he was asked: "You say that when Mr. Broughton told your wife that if the boy stayed with him he could clothe him and send him to school and pay his doctor's bills, that you said that was more than you could do for him?" A. "And give him what they had at their death." Q. "How was he to give him that?" A. "At their death, he said that when he died they would get what they had left." Q. "Use the exact language." A. "He said that he should have what they had at their death."

There is further evidence as to the old gentleman soliciting Mr. Crawford and Mrs. Bell to assist in procuring Mrs. Crawford's permission for him to keep the boy and as to subsequent statements on his part as to what he intended to do for him, though in none of them is there a direct admission as to an agreement on his part to devise the estate.

Much evidence was taken in an effort to show that during the last five or six years of G. W. Broughton's life Forest made his home with his mother and that thereby the consideration for the agreement failed. The sum and substance of this is that Forest was mistreated by a workhand in the service of G. W. Broughton, that when this was discovered an agreement was made by G. W. Broughton and Forest's mother by which Forest went to his mother's and remained a few weeks until after the hand left and that then, his former relations were continued.

After that he was frequently at his mother's, and the two families exchanged work and lived on familiar terms with each other; but this does not seem to have been inconsistent with his duties to his grandfather, so the question to be determined is, was an enforceable contract proven?

It may be said that "an oral agreement to devise real estate to another in consideration of services to be performed is within the statute of frauds and cannot be enforced" (Duke's Admr. v. Crump, 185 Ky. 323; Bobbitt v. James, 148 Ky. 244; Spears v. Sewell, 4 Bush 239; Boone v. Coe, 153 Ky. 233); but in a long line of cases it has been held a recovery may be had upon parol contracts of that character where the consideration has been fully performed. Waters v. Cline, 85 S. W. 209; Benge v. Hieatt, 82 Ky. 666; Doty's Admr. v. Doty's Gdn., 118 Ky. 204.

The measure of the recovery depends upon the character of service. Where the benefit to the intestate can be measured by ascertaining the reasonable value of the claimant's services such will be the measure of his recovery. Duke's Admr. v. Crump, *supra;* Bobbitt v. Jones, *supra;* Spears v. Sewell, *supra.*

Where the benefits to the intestate cannot be measured by any of the ordinary pecuniary standards the courts adopt the one fixed by the parties themselves, and award the claimant the value of the property promised. Waters v. Cline, *supra;* Berry v. Graddy, 1 Metc. 553; Benge v. Hieatt, *supra;* Usher's Extrxs. v. Flood, 17 S. W. 132; Jones v. Comer, 25 Ky. Law Reporter 773; Doty's Admr. v. Doty's Gdn., *supra.* And in an exceptional case specific performance has been awarded. Skinner v. Rasche, 165 Ky. 108.

Such claims are thus upheld, but to be enforceable they must clearly be founded on contract and established by convincing proof. So many opportunities are afforded for the spoliation of estates, it is so easy for unscrupulous persons to fabricate evidence after the death of the testator, and it is so hard to meet that character of proof, and a casual conversation, expression of intention or invitation may so easily be misconstrued and distorted into an agreement, that in the absence of such a rule it would be dangerous for a person to exercise generosity or hospitality or to accept any sort of service of this character, without a thorough understanding that he was incurring no liability therefor.

In the present case there is nothing in the record to show any fabrication of fact or attempted spoliation, and the above reference to those matters is only for the purpose of illustrating the reason for the rule, as it applies in all cases.

Applying that rule it does not appear that the facts proven measure up to the requirements. Accepting the witnesses' statements as true, it appears that Forest was the only grandson and heir apparent; that his grandfather had a strong affection for him and wanted him to remain with him; no doubt he insisted upon his so doing, and it is quite likely the conversation took place, as stated, although it will be observed that the agreement as detailed by each of the witnesses is incomplete, and while similar in substance, is not expressed in the same words. Possibly the old gentleman intended to agree to

devise all of his property to Forest at his and his wife's death. Perhaps he only meant that Forest would inherit all of his property at his death. Neither the words "give," "devise" or similar words appear in the conversation nor is there any reference to a will. Mrs. Crawford's language is: "He (Forest) *could* have all he had at the time of his and his wife's death." Mrs. Bell states: "He *would see* at his death and his wife's death that he (Forest) *should* have what was left." William Crawford: "The child *could get* what him and her had at his and her death." His further language is: "At their death he said that when he died they *would* get what they had left. . . . He said he (Forest) *should* have what they had at their death."

Whatever the claims of the appellant, it must be admitted that this language is ambiguous and does not clearly indicate that the intestate agreed either to surrender all of his property or his right to devise same or to make provisions for his aged spouse. At any rate without entering into any subtle refinements of distinction the evidence is not of such convincing character as to authorize the court to enter a judgment passing this estate and denying to the testator the right to control and devise it.

Wherefore the judgment is affirmed.