**Georgia Ethel NAPIER, Appellant,**

**v.**

**Walter HODGE, Jr., et al., Appellees.**

Court of Appeals of Kentucky.

Sept. 28, 1956.

Cleon K. Calvert, Pineville, W. C. Hoskins, Hyden, for appellant.

Calvert C. Little, London, for appellees.

MOREMEN, Judge.

Appellant, Georgia Ethel Napier, illegitimate daughter of George Hodge, has appealed from a judgment which denied her claim that she was entitled to inherit his entire estate. We have stated that appellant is the daughter of George Hodge because the chancellor so held from sufficient evidence, but if George Hodge ever acknowledged paternity, he did so only upon one occasion in his entire life.

Florence Gilford began her association with Hodge not long after the turn of the century when she was living with her parents at Livingston. They kept company

for a year or two but did not marry. Appellant was born of Florence Gilford in the year 1907 in East Bernstadt where her family had moved. About one week after the day of appellant's birth, Hodge went to the home of Florence Gilford's father and mother and there allegedly made a contract for the benefit of appellant upon which this suit is based.

It is related that those present were Florence Gilford's parents, her brother Will Gilford, who was ten years of age at the time, Florence Gilford, George Hodge and, of course, appellant. The witnesses say that Florence Gilford's parents had threatened to take court proceedings against George Hodge and prosecute him in court concerning the baby. Florence Gilford, the unwed mother, Will Gilford and appellant are the only ones of this group who are now living, and it is by the testimony of appellant's mother and uncle that she attempts to establish the contract. The witnesses stated that when George Hodge visited the home of the grandparents, he viewed the baby and admitted that he was the father. Florence Gilford testified: "Yes, he said he would make her his heir and provide for her and see that she never wanted for anything." On this point Will Gilford stated: "He said he would see that the child was well taken care of and never want for anything. That is the way he spoke it." Also "Said that he would see she always had everything she wanted and never want for anything and was well taken care of. That was his words."

Other evidence in the record, interpreted in the light of human experience which seems to deny the truth of the above quoted statements, is that after this meeting the unwed mother never saw Hodge again; he never again admitted paternity and never again was any claim made upon him for the support of the child, nor were any proceedings had against him. The unwed mother testified that she and deceased were going to "marry up." Instead, she married John Taylor and bore seven children by him.

Appellant was reared as if she were in fact a child of John Taylor. She assumed his surname, and various census reports and school records indicate that appellant, on all occasions, had been certified as being the daughter of John Taylor. Even appellant's marriage license listed him as her father.

George Hodge continued to be a bachelor for the remainder of his life. He lived with his mother on a tract of land which now is the principal asset of his estate. His mother had deeded it to him, apparently retaining a life estate, and exacted from him a promise to care for her during the balance of her life. Later, one of George's nephews came to this place and took care of George and his mother at a time when she was 96 years of age and he was bedfast. Afterwards, other people were hired by the nephew to discharge this burden. Other nieces and nephews rendered service to them.

We are confronted, therefore, with the difficult determination of whether these words, which may or may not have been placed in the dead man's mouth by the witnesses, are sufficient to prove a contract that would deny the force of our statute on this question.

Subsection (2) of KRS 391.090 reads:

"A bastard shall inherit only from his mother and his mother's kindred."

■ The foregoing legislative fiat has been tempered to the extent that it is now the rule in our jurisdiction that a promise by the father to the unwed mother to maintain the illegitimate child and provide for it out of his estate in consideration of the mother's agreement not to institute bastardy proceedings is valid and enforceable. Moore v. Moore's Adm'r, 298 Ky. 312, 182 S.W.2d 886; Bowling v. Bowling's Adm'r, 222 Ky. 396, 300 S.W. 876. On the other hand, we have held that the mother's agreement not to prosecute the father on the charge of seduction or other criminal charges is contrary to public policy and void. Clark's

Adm'x v. Campbell, 212 Ky. 341, 279 S.W. 2d 327.

In cases where the alleged agreement was to forbear from instituting bastardy proceedings, the courts have been careful to require that the agreement be proved by clear and convincing evidence before the provision of the statute above quoted is overridden.

■ This rule conforms with the general rule that where a claim is brought forth, after death, of an agreement to distribute decedent's estate in a way different from that provided by law, it is regarded with suspicion, particularly where there is no writing evidencing it. Finn v. Finn's Adm'r, Ky., 244 S.W.2d 435, 437; Broughton v. Broughton's Adm'r, 203 Ky. 692, 262 S.W. 1089. It was pointed out in the Finn case:

"In determining whether such contract was made, the weakness or the strength of the direct evidence often depends upon the circumstances. The element of reasonable probabilities must enter into the solution. Whether the claimed contract accords with what is natural or unnatural in common experiences and observations is perhaps of most importance. But this rule of clear proof does not require the exclusion of any controversy."

■ We pointed out in Caudill v. Caudill, Ky., 257 S.W.2d 557, that the very intimacy of such an agreement as is averred here concerns matters which the parties generally do not desire to have highly publicized or consummated in the presence of many witnesses, but we recognized that the circumstances of the contract's inception must be considered in the light of the actions of the parties both at the time and subsequently, and held that where a father accepted the child fully, gave her his surname, provided a home for her, claimed her as a tax exemption, and in many ways demonstrated that he felt obligated to her, such facts were sufficient corroboration of the mother's claim that he had made a direct contract with valid consideration. In most of the cases we have examined, the circumstances support a belief that the contract had been made—rather than deny its existence, as in this case.

■ When we measure the proof of the contract alleged in the case at bar in light of the surrounding facts, we do not find it unequivocal or clear and there is little indication that the terms of agreement were mutually understood. It will be remarked that while Florence Gilford testified "he would make her his heir," the general import of her testimony seems to be that pressure was being applied for the purpose of exacting a promise for support of the child. Will Gilford, who undertook to give Hodge's exact words on two occasions in his testimony, mentioned only that the promise was to see that the child was provided for.

It is also impossible to conclude from the testimony of the witnesses the exact nature of the proposed proceedings against George Hodge. The expressions used by the witnesses never referred directly to bastardy proceedings against him or any court action seeking the support or maintenance of appellant or an adjudication that she would be his heir. We pointed out above that in some types of proceedings the agreement to forbear prosecution is a valid consideration and in others it is not.

After consideration of the whole record we have concluded that the chancellor's finding of fact is clearly correct and should not be disturbed, CR 52, particularly in view of the fact that if any contract of any nature was ever consummated, the actions of all the parties for a period of 47 years afterwards indicate that its terms were never mutually understood and no inclination was shown by anyone to treat it as a valid living agreement. Even if the contract had been made, it was abandoned.

Judgment affirmed.